WALKER LOGGING and American Interstate Insurance
v. John PASCHAL and The Second Injury Fund

CA 91-17                                    821 S.W.2d 786

Court of Appeals of Arkansas
Division II
Opinion delivered January 8, 1992

248

*Shackleford, Shackleford, & Phillips, P.A.*, for appellant.

*Terry Pence*, for appellee.

MELVIN MAYFIELD, Judge. The appellant Walker Logging appeals a decision of the Workers' Compensation Commission which held that the claimant, John Paschal, is permanently and totally disabled and that the Second Injury Fund has no liability. We affirm.

At a hearing on Mr. Paschal's claim for additional benefits it was stipulated that he sustained a work related injury on August 13, 1987; that temporary total disability benefits had been paid; and that permanent partial disability payments had been paid on a scheduled injury rating of 30% to the right lower extremity. The claimant contended he was totally and permanently disabled.

The appellant-employer contended that the claimant was not permanently totally disabled; that the Commission should take into account the claimant's refusal to pursue vocational rehabilitation; and, if the claimant was adjudged permanently totally disabled, then any award in excess of the 30% scheduled injury was the liability of the Second Injury Fund.

The Second Injury Fund contended that the claimant was not permanently totally disabled; that there had been no showing of a combination of injuries to invoke Fund exposure; and that the claimant suffered from a scheduled injury for which no further benefits were due.

The administrative law judge held that the claimant's

compensable injury had combined with his prior back condition to result in permanent, total disability; that the appellant was liable for all medical and related expenses and for permanent, partial disability of 30% to the right lower extremity; and that the Second Injury Fund was liable for all excess permanent, total disability benefits. The Second Injury Fund appealed to the Commission which affirmed the law judge's finding that the claimant was totally and permanently disabled but reversed the liability of the Second Injury Fund.

The claimant-appellee is a man in his late forties who left school at age 17 after being promoted to the eighth grade. He testified he cannot read or write; he has worked at many jobs during his lifetime, all of which involved heavy manual labor; and he was refused employment, or fired from, several jobs because of a back problem. The claimant said he was working for appellant as a timber cutter when he was injured on August 13, 1987, when a tree fell on him and he suffered an injury to his right knee. Dr. Robert S. Bell, orthopedic surgeon, repaired the knee surgically and reported in a letter dated September 11, 1987, that the claimant was found to have a torn medial collateral ligament, torn anterior cruciate, torn posterior cruciate, torn lateral meniscus and torn patella tendon, as well as, torn lateral capsular ligament. The claimant testified that his knee swells when he is on it for more than a few minutes at a time; he walks with a cane; he sleeps poorly because his back and knee hurt; he has to have regular injections in the knee; he can do nothing to help around the house, cannot mow the lawn, change the oil in his truck or help with the gardening; and he had to purchase a van so he could keep his knee stretched out when he had to ride somewhere.

The record contains a number of letters from Dr. Bell reporting his findings in the months following the claimant's knee reconstruction. They reflect that for several months the claimant appeared to be healing nicely. On January 25, 1988, Dr. Bell stated:

> John is seen in follow-up of cruciate reconstruction. He now has 95 degrees of flexion. He is continuing to improve his strength. He has good stability at this time. I am going to plan to admit John to Union Medical Center for arthroscopy of his knee and removal of staples.

On May 9, 1988, Dr. Bell reported that for the extent of his injury the claimant was doing remarkably well; he said the claimant could not, however, return to activities which required excessive walking and climbing on unlevel ground and he gave the claimant a permanent impairment rating of 20% to the lower extremity. Approximately a month later Dr. Bell reexamined the claimant and repeated his x-rays. In a letter dated June 3, 1988, he stated that the claimant was showing increased swelling in his knee and some early degenerative changes which he had not taken into account in the earlier rating. Dr. Bell said for that reason he felt he had under-rated the claimant and he increased his permanent impairment rating to 30% to the lower extremity.

Dr. W. S. Burdick, an orthopedic surgeon with The Bone & Joint Clinic in Shreveport, Louisiana, examined the claimant on November 8, 1988, on referral from Dr. Bell and reported:

> Impression: Postoperative repair of severe ligamentous injury, right knee; traumatic chondromalacia, right knee, with a definite prognosis of traumatic osteoarthritis developing in the knee. I think that, from the stability standpoint, the patient had an excellent repair of the severe ligament injury, but I think the articular cartilage damage is going to prevent this patient from returning to his previous type of work, which was working in the woods and on uneven ground. I would not think that he could return to any work of this type or work that required repeated squatting, bending or walking any significant distance. I think the patient is going to have to be retrained for some other semi-sedentary or sedentary type of occupation.

The claimant testified that he has suffered from back problems since he was 12 years old. On March 6, 1986, Dr. Ernest R. Hartmann, an orthopedic surgeon who performed a pre-employment physical on the claimant for Cooper Industrial, reported that he had a sacralized L5 disc. In a follow up letter Dr. Hartmann explained that "sacralization means that the normal, finger-like transverse process which sticks out from the side of the vertebra is deformed to the extent that it has configuration of the sacrum and will form abnormal joints which can become a source of a back problem." He said this was a congenital abnormality that would not constitute a rateable, residual disability.

Appellant first argues on appeal that the Commission erred in holding that the claimant was permanently and totally disabled. When reviewing a decision of the Workers' Compensation Commission, we must view the evidence and all reasonable inferences deducible therefrom in the light most favorable to the findings of the Commission and affirm that decision if it is supported by substantial evidence. *Clark* v. *Peabody Testing Service*, 265 Ark. 489, 579 S.W.2d 360 (1979). The issue is not whether we might have reached a different result or whether the evidence would have supported a contrary finding; if reasonable minds could reach the Commission's conclusion, we must affirm its decision. *Bearden Lumber Company* v. *Bond*, 7 Ark. App. 65, 644 S.W.2d 321 (1983). We think there is substantial evidence to support the Commission's finding of total and permanent disability.

■ Appellant also argues that the claimant should be required to have a vocational rehabilitation analysis. It argues that the claimant had agreed to such an analysis then, after he "got on Social Security disability (August 29, 1989) he was no longer interested in vocational rehabilitation." The claimant testified he was unable to work, his wife did not work, he has a 14-year-old child still living at home, and his social security disability check is approximately $89 per month. The record shows that the claimant had agreed at a deposition to vocational rehabilitation testing. However, the appellant failed to arrange for the testing until two weeks before the hearing was scheduled to take place then wanted to get the hearing postponed so it *could arrange* for the claimant to be tested. It was then that the claimant declined — because he did not want the hearing delayed any longer. The statute provides that a claimant must request vocational rehabilitation. *See* Ark. Code Ann. § 11-9-505(c) (1987). Therefore, it was within the claimant's prerogative to refuse to consent to delay the hearing so vocational rehabilitation could be arranged.

The appellant also points out that the Commission found that based upon the claimant's mental capacity, age, education, work experience, and physical impairment and limitations, he had presented a prima facie case that he falls within the odd-lot category, thus shifting to appellant the burden of going forth with evidence that some kind of suitable work is regularly and continuously available to the claimant. Appellant complains that

at no point in the hearing did the claimant contend that he fell into the odd-lot category, that this raised a new issue on appeal and that its only option to rebut the odd-lot doctrine was a vocational rehabilitation evaluation, which was not ordered.

In *M.M. Cohn Co.* v. *Haile*, 267 Ark. 734, 589 S.W.2d 600 (Ark. App. 1979), it was stated:

> The Arkansas Supreme Court long ago departed from the restrictive view that only anatomical or functional disability could be considered in determining disability to the body as a whole. The departure came in *Glass v. Edens*, 233 Ark. 786, 346 S.W.2d 685 (1961), and since that case was decided we have been among the great majority of jurisdictions which allow consideration of several factors in determining not just functional bodily limitations, but loss of earning capacity as a predicate for workers' compensation. See Wright, *Compensation for Loss of Earning Capacity*, 18 ARK.L.REV. 269 (1965), and 2 Larson, *Workmen's Compensation Law*, §§ 57.51 and 57.61 (1976). Professor Larson suggests the principal and the factors as follows:
>
> > If the evidence of degree of obvious physical impairment, coupled with other factors such as claimant's mental capacity, education, training, or age, places claimant *prima facie* in the odd-lot category, the burden should be on the employer to show that some kind of suitable work is regularly and continuously available to the claimant. [2 Larson, *supra*, § 57.61, pp. 10-136 and 10-137]
>
> The odd lot doctrine refers to employees who are able to work only a small amount. The fact they can work some does not preclude them from being considered totally disabled if their overall job prospects are negligible. 2 Larson, *supra*, § 57.51, pp. 10-107, *et seq.*

267 Ark. at 736. *See also, Lewis* v. *Camelot Hotel*, 35 Ark. App. 212, 816 S.W.2d 632 (1991); *Hyman* v. *Framland Feed Mill*, 24 Ark. App. 63, 748 S.W.2d 151 (1988); *Johnson* v. *Research-Cottrell*, 15 Ark. App. 48, 689 S.W.2d 8 (1985). Therefore, under the circumstances known to appellant prior to the hearing,

and because of the total and permanent disability claim the appellant knew that the appellee was making, the appellant was on notice that the odd-lot doctrine was an issue.

■ The appellant also argues that the Commission erred in holding that it is solely liable for all benefits for permanent, total disability. In *Mid-State Construction Co.* v. *Second Injury Fund*, 295 Ark. 1, 746 S.W.2d 539 (1988), the Arkansas Supreme Court set forth a tripartite test for Second Injury Fund liability.

> 1. The employee must have suffered a compensable injury at his present place of employment.
> 2. Prior to that injury the employee must have had a permanent partial disability or impairment.
> 3. The disability or impairment must have combined with the recent compensable injury to produce the current disability status.

295 Ark. at 5. It was stipulated that the claimant suffered a compensable injury while employed by appellant. The Commission found, however, that the second and third prongs of the test had not been met because the claimant did not have any permanent disability or impairment prior to his knee injury and there was no evidence that the conditions combined to create the claimant's permanent total disability.

■ Appellant contends that it was error for the Commission to rely on Dr. Hartmann's statement that the claimant's congenital back condition "would not constitute a rateable, residual disability" because the Commission ignored Dr. Hartmann's follow-up statement that the claimant would be excluded from any job which required pre-employment back x-rays. The claimant testified that he had been steadily employed since he was seventeen, although he had been troubled by his back throughout his life and had frequently missed work days because of his back. He also testified he had been denied employment by Cooper Industrial because he couldn't pass the physical and he was fired after working a week for Georgia-Pacific because he couldn't pass the physical. However, as the Commission found, there is no medical evidence in the record showing that the claimant was ever given a permanent disability rating on his back or placed on any physical restriction because of his back. Furthermore, the Commission found that the claimant's "permanent disability

results solely from the effects of the compensable knee injury." There is ample evidence in the record to support that finding.

Affirmed.

CRACRAFT, C.J., and DANIELSON, J., agree.